UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| COPIA COMMUNICATIONS, LLC, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | Civil Action No. 14-13056-LTS |
| AMRESORTS, L.P., a Pennsylvania limited partnership and as successor-in-interest to AM Resorts, LLC, and SEAWIND KEY INVESTMENTS, LIMITED, a Jamaican corporation, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

ORDER ON DEFENDANTS' MOTIONS TO DISMISS

February 5, 2015

SOROKIN, J.

Plaintiff Copia Communications, LLC, is suing AMResorts, L.P. and Seawind Key Investments Limited, for breach of contract and related claims arising out of Internet services Copia supplied to Seawind at two resort hotels in Jamaica. Both Defendants have moved to dismiss for lack of personal jurisdiction and assert that Jamaica is the appropriate forum for this litigation.

For the reasons that follow, both motions to dismiss are ALLOWED.

I.  FACTUAL BACKGROUND

The following facts are drawn from the Complaint and the parties' factual submissions. Because this motion concerns whether the Court has personal jurisdiction over the defendants, the Court may consider facts beyond those alleged in the complaint. Carreras v. PMG Collins,

LLC, 660 F.3d 549, 552 (1st Cir. 2011). All disputed issues of fact are resolved in Plaintiff's favor and all reasonable inferences are also drawn in Plaintiff's favor. Id.

Plaintiff, Copia, is a Massachusetts limited liability company, which provides Internet services to resort hotels. Docket #1 ¶¶ 4, 10. Defendant, AMResorts, L.P., is a Pennsylvania limited partnership, which provides "brand licensing, hotel management assistance services, and online distribution and sales services for all-inclusive hotels located in the Caribbean and Central America." Docket #30 at 4. Defendant, Seawind, is a Jamaican corporation, which owns the two resort hotels in Jamaica central to this case. Docket #22 at 4.

Neither Defendant is registered to do business in Massachusetts, pays taxes in Massachusetts, employs anyone in Massachusetts, nor has an office, a bank account, or property in Massachusetts. Docket #25 ¶¶ 6-9; Docket #29-1 ¶¶ 5-10. AMResorts maintains a website that allows people internationally to view its hotel brands and make reservations. Docket #29-1 ¶ 4. Darryl Wehmeyer, Copia's manager, attests that he "understand[s] that the Defendants advertise heavily in the United States, and including in the Commonwealth of the [(*sic*)] Massachusetts." Docket #29-2 ¶ 7.

In approximately April 2009, Wehmeyer "began negotiations with the Defendants for customer Internet services" at two new Jamaican resorts owned by Seawind. Docket #1 ¶¶ 6, 10. Copia previously had submitted a quote for complete wireless coverage of the resorts in November 2008. Docket #28 ¶ 12; Docket #28-2 at 2. In January 2009, not having received any feedback, Wehmeyer wrote to Seawind's Michael McMorris seeking help in overcoming possible language barriers with certain individuals, and asking him to "communicate with them the great importance Copia has put on this project and that we want to be sure that we are getting across all the information for our services." Docket #28 ¶ 12; Docket #28-2 at 2.

Negotiations continued through June and July of 2009. Docket #1 ¶ 13. Wehmeyer received emails in the course of the negotiations (and later the relationship) some of which he may have read at Copia's principal place of business in Massachusetts. Docket #1 ¶ 4; see, e.g., Docket #1-1 at 2-14. Copia also had offices in Jamaica and sent a proforma invoice to Seawind with an estimate of costs on its Jamaican office letterhead. Docket #1-1 at 5; Docket #1-2 at 2. Several in-person meetings took place in Jamaica during the negotiations, Docket #25 ¶ 23, and Wehmeyer maintained both a Massachusetts and a Jamaican cell phone. Docket #28-2 at 2; Docket #49-2 ¶ 11. It is undisputed that no meetings took place in Massachusetts during the negotiations.

On June 29, 2009, Copia and Seawind entered into the contract for Copia to provide the Internet services at the two Jamaican resorts. Docket #1-2 at 2. Salvador Luque Garcia, Seawind's current Chairman, attests that the contract "was first drafted by Copia[,]" and that "Copia sent a draft of the Contract to Seawind and AM Jamaica employees in Jamaica to review during the negotiations." Docket #25 ¶¶ 24, 25. This testimony is supported by the contract itself, which identifies the parties as "COPIA" and "Customer," "Customer" being Seawind, thus reflecting Copia as the author. Docket #1-2 at 2.

The contract identifies Copia as a Massachusetts corporation "with offices in Jamaica[,]" and Seawind as a Jamaican corporation. Docket #1-2 at 2. Copia's Massachusetts address appears only at the end of the contract just above the signature line. Docket #1-2 at 12. The address(es) of Copia's "Jamaican offices" is not listed. The contract established that: 1) Copia "will configure and install the [Internet services] Solution at the Installed Property[;]" 2) "Products contained in the Solution shall remain the absolute property of Copia[;]" and 3) "The Solution [the means of delivering Internet services to Seawind and its guests] shall at all times

remain the exclusive and absolute property of COPIA and the Solution is provided to CUSTOMER for use by CUSTOMER exclusively in connection with its business." Docket #1-2 ¶¶ 2.1(k), 3.1-3.3. It further obligates Copia to "provide on-going technical support, maintenance and services . . . for each Solution . . . [and to] provide bandwidth for guest connectivity at the Installed Property to the Internet, equipment associated with Internet connectivity throughout the property and software on the guest network needed to provide the solution." Docket #1-2 ¶¶ 4.1-4.3. The contract states that the "Installed Property" is described in "Project Schedule 1 hereto." Docket #1-2 at 3 ¶ 2.1(h). Such schedule is not in the record. The parties do not dispute, however, that "Installed Property" refers to the two resort hotels in Jamaica at issue: Secrets St. James Montego Bay and Secrets Wild Orchid Montego Bay, both owned by Seawind. Furthermore, while evidence indicates that AMResorts may have operated some hotels in the Caribbean, there is no evidence that AMResorts operates these two hotels owned by Seawind.

Seawind was to pay Copia "the percentage of Revenue Share as identified in each Project Schedule[,]" and "COPIA [would] also accept payments directly from the end users of the solution." Docket #1-2 ¶ 6.1. Payment was required in United States dollars, Docket #1-2 ¶ 6.5, but no term required that payment be sent to a particular address.

The contract prohibited Seawind from removing "any Equipment or Products from the Installed Property for any reason without the prior written consent of COPIA." Docket #1-2 ¶ 8.0. An "EXPORT CONTROL" clause provided that "[t]he parties acknowledge that any Products and technical information (including, but not limited to, services and training) provided under this Agreement are subject to United States export laws and regulations and any use or transfer of such Products and technical information must be authorized under those regulations."

Docket 1-2 ¶ 9.0. Nothing in the contract, however, specified that any equipment or component of the solution would be manufactured in, or originate specifically from Massachusetts.

A notice provision required that "[s]ervice of any legal proceedings concerning or arising out of this Agreement shall be effected by causing the same to be delivered to the statutory agent or company secretary of the party to be served at its registered office, or at such other address as may from time to time be notified in writing by the party concerned. Until further notice, the respective addresses for the parties shall be as first set forth above." Docket #1-2 ¶ 18.3. A choice of law clause specifies that the "Agreement shall be governed by and construed in all respects in accordance with the laws of Jamaica, W.I. and each party hereby submits to the non-exclusive jurisdiction of the Courts of Jamaica W.I." Docket #1-2 ¶ 17.0.

Manuel Garcia, a Seawind employee at the time, attests that "[p]ursuant to [his] written request, and consistent with the ongoing negotiations occurring in Jamaica, Wehmeyer, on behalf of Copia, executed the Contract at Seawind's office in Jamaica." Docket #26 ¶ 9; Docket #1-2 at 14. This is undisputed in the record.[1] Copia and Seawind were the only signatories on the contract. Docket #1-2 at 12.

During the contractual relationship Copia shipped telecommunications equipment to Jamaica from Massachusetts in order for Copia to perform. Docket 49-2 ¶ 7. "Payments under the contract and for equipment were made by the Defendants to Copia, in Massachusetts." Id. ¶ 7. While "[t]he address of the check payments [was] [Copia's] Massachusetts business address[,]" id. ¶ 6, Wehmeyer does not attest that he received the payments in Massachusetts. "[O]n occasion, communications via telephone or e-mail were sent and received while

---

[1] Copia's papers are silent on where Wehmeyer was when he signed the contract. At the motion hearing held on January 14, 2015, Plaintiff's counsel said, "But the contract is signed by Copia Communications in Massachusetts . . . ." Docket #65 at 14:18-19. Shortly thereafter Plaintiff's counsel clarified: "We clearly have, as in the Downer case, both parties sign a contract and go back to their respective home offices." Id. at 15:18-20.

[Wehmeyer] was in Massachusetts." Id. ¶ 6. It is undisputed, however, that no one from Seawind (or AMResorts) traveled to Massachusetts at any point during the relationship.

Performance took place entirely in Jamaica. Copia's obligations under the contract were to provide for "Internet access and computer equipment rentals and an Internet Café to [Seawind's] guests at the [Jamaican resorts]." Docket #1-2 at 2 ¶ 1.2. Copia installed the equipment at the Jamaican resorts, Docket #26 ¶ 13, provided service and maintenance at the resorts, Docket #27 ¶ 8, daily made available several Copia employees on-site to assist with any maintenance and performance issues, Docket #27 ¶ 9, and "consistently maintained at least two, if not three, employees on-site at the Resorts' Business Center." Docket #27 ¶ 10. In or around May 8, 2010, Wehmeyer responded to a resort guest's complaint about the Internet service saying, "were you ever made aware that we have technicians on property seven days a week in order to assist you in connecting to the Internet[?]" Docket #26-5 at 2.

On April 28, 2014, Seawind's Emilio Huhn notified Wehmeyer by email and attached letter that Seawind had decided not to renew the contract. Docket #1-3 at 7-8. Huhn offered to "meet to discuss next time you [Wehmeyer] come to the island." Id. Plaintiff objected contending that the termination notice was untimely to effect a termination in advance of the renewal of the contract for another year on May 1, 2014. Docket #1-3 at 11.

The parties were unable to reach agreement on their dispute. Plaintiff brought this action asserting claims for breach of contract, breach of the implied covenant of good faith and fair dealing, promissory estoppel, unjust enrichment, fraud and deceit, negligent misrepresentation, civil conspiracy, and violations of Mass. Gen. Laws ch. 93A, § 11. Both Defendants have moved to dismiss.

II.     LEGAL STANDARD

A "plaintiff bears the burden of proving the court's personal jurisdiction over the defendant." Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42, 50 (1st Cir. 2002). To defeat a motion to dismiss under the prima facie standard, "the plaintiff must make the showing as to every fact required to satisfy 'both the forum's long-arm statue and the due process clause of the Constitution.'" Boit v. Gar-Tec Products, Inc., 967 F.2d 671, 675 (1st Cir. 1992) (quoting U.S.S. Yachts, Inc. v. Ocean Yachts, Inc., 894 F.2d 9, 11 (1st Cir. 1990)). The showing "must be based on evidence of specific facts set forth in the record[,]" which "go beyond the pleadings and make affirmative proof." Id. (internal quotations omitted). "It has long been the rule of [the First Circuit], . . . , that plaintiffs may not rely on unsupported allegations in their pleadings to make a prima facie showing of personal jurisdiction." Id. The district court "accepts properly supported proffers of evidence by a plaintiff as true[,]" id., "and construe[s] them in the light most congenial to the plaintiff's jurisdictional claim," Phillips v. Prairie Eye Ctr., 530 F.3d 22, 26 (1st Cir. 2008).

The First Circuit has "construed the Massachusetts long-arm statute as being coextensive with the limits permitted by the Constitution." Adelson v. Hananel, 652 F.3d 75, 80 (1st Cir. 2011) (citing Daynard, 290 F.3d at 52). Thus, the applicable analysis is expressed in the due process test. Id. "[D]ue process requires only that in order to subject a defendant to a judgment in personam, . . . [the defendant must] have certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (quoting Milliken v. Meyer, 311 U.S. 457, 463 (1940)). The touchstone of minimum contacts is "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum

State, thus invoking the benefits and protections of its laws." Hanson v. Denckla, 357 U.S. 235, 253 (1958).

"Personal jurisdiction may be either general or specific." Cossaboon v. Maine Med. Ctr., 600 F.3d 25, 31 (1st Cir. 2010). "General jurisdiction exists when the litigation is not directly founded on the defendant's forum-based contacts, but the defendant has nevertheless engaged in continuous and systematic activity, unrelated to the suit, in the forum state." United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp., 960 F.2d 1080, 1088 (1st Cir. 1992). "A court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." Goodyear Dunlop Tires Operations, S.A. v. Brown, 131 S. Ct. 2846, 2851 (U.S. 2011). Copia "relies on specific jurisdiction in its analysis."[2] Docket #58 at 4.

For specific jurisdiction the minimum contacts analysis is divided into the three categories of relatedness, purposeful availment, and reasonableness as follows:

> First, the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities. Second, the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable. Third, the exercise of jurisdiction must, in light of the Gestalt factors, be reasonable.

Adelson, 510 F.3d 43, 49 (1st Cir. 2007) (quoting Daynard, 290 F.3d at 60). Relatedness "focuses on the 'nexus between the defendant's contacts and the plaintiff's cause of action.'" Id. (quoting Ticketmaster-New York, Inc. v. Alioto, 26 F.3d 201, 206 (1st Cir. 1994)). "[W]here the cause of action is for an alleged breach of contract, [courts] ask whether the defendant's activity

---

[2] Furthermore, Copia has not shown, on this record, that either Defendant had such continuous and systematic contacts in Massachusetts "as to render them essentially at home" in Massachusetts. See Goodyear Dunlop Tires, 131 S. Ct. at 2851.

8

in the forum state was 'instrumental either in the formation of the contract or its breach[,]'" id. (quoting Phillips Exeter Acad. v. Howard Phillips Fund, 196 F.3d 284, 289 (1st Cir. 1999)), and "whether the defendant was 'subject to substantial control and ongoing connection to [Massachusetts] in the performance of the contract.'" Adelson, 652 F.3d at 81 (quoting Adams v. Adams, 601 F.3d 1, 6 (1st Cir. 2010)). Courts further "may look to and draw inferences from the parties' prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." Adelson, 510 F.3d 43, 49 (internal quotations omitted). When tort claims are bound up in the contract claims, the inquiry remains the same. Phillips, 530 F.3d at 27.

The purposeful availment requirement "ensures that jurisdiction is not based on merely 'random, isolated or fortuitous' contacts with the forum state." Adelson, 510 F.3d at 50. "The two key focal points of this concept are voluntariness and foreseeability." Id. "Voluntariness requires that the defendant's contacts with the forum state 'proximately result from actions by the defendant *himself.*'" Phillips, 530 F.3d at 28 (emphasis original) (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985)). Foreseeability requires that "[t]he defendant's contacts must be such that he could 'reasonably anticipate being haled into court there.'" Id. (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980)).

Finally, whether the assertion of jurisdiction is reasonable and fair depends on consideration of five factors know as the "Gestalt factors." Id. at 51. They are:

> (1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies.

Id. The emphasis on these factors is greater "where the minimum contacts question is very close." Id.

III.   DISCUSSION

Copia has not met its burden to establish all three preconditions for the exercise of specific jurisdiction. To support the exercise of personal jurisdiction, Copia points to 1) the payment checks with Copia's Massachusetts address, 2) the telephone calls and emails Wehmeyer received on occasion while he was in Massachusetts, 3) the contract clause indicating that notice be given to Copia in Massachusetts, 4) the equipment that was shipped from Massachusetts to Jamaica, and 5) Defendants' marketing efforts in Massachusetts. These contacts fail to establish specific jurisdiction on relatedness and purposeful availment grounds.

*Relatedness*

"[T]he relatedness requirement is not met merely because a plaintiff's cause of action arose out of the general relationship between the parties; rather, the action must directly arise out of the specific contacts between the defendant and the forum state." Phillips Exeter Acad., 196 F.3d at 290 (quoting Sawtelle v. Farrell, 70 F.3d 1381, 1389 (1st Cir. 1995)). Copia's claims do not arise out of any of defendants' activities in this forum.

First, the contract was not "formalized and entered into" in Massachusetts. In Adelson, the First Circuit agreed with the court below that, "[n]othing could be more instrumental in the formation of a contract than the literal act of forming the contract itself." 510 F.3d at 49 (finding relatedness where employment contract was "formalized and entered into" during defendant's trip to forum). Here, both parties signed the contract in Jamaica. Nor was there any other Massachusetts contact that was instrumental in forming the contract: Copia made a proposal to Defendants in Jamaica and the parties negotiated in Jamaica.³ Furthermore, Seawind's decision

---

³ Plaintiff attaches a few emails which address points discussed during previous in-person negotiations outside Massachusetts. See Docket #1-1 at 3, 10. Wehmeyer does not claim he read these emails in Massachusetts or that Defendants expected them to be read here. Furthermore, there is no evidence in the record that these emails were instrumental in forming the contract or were anything other than ancillary to the in-person meetings.

about when to notify Copia that it was terminating the contract was made outside Massachusetts, and therefore, service of notice provision notwithstanding, does not constitute a Massachusetts contact which was instrumental in an alleged breach. See Phillips Exeter Acad., 196 F.3d at 290-91 (considering defendant's extra-forum decision to shortchange payments sent into forum in finding no relatedness).

Second, the parties did not contemplate future consequences within Massachusetts in their prior negotiations, their course of dealing, or through the terms of the contract. See Adelson, 510 F.3d at 49. The Defendants did not come to Massachusetts, they did not solicit assistance from Massachusetts, and they did not ask for (or receive) performance from Massachusetts, as all of Plaintiff's performance occurred in Jamaica.[4] Cf. C.W. Downer & Co. v. Bioriginal Food & Sci. Corp., 771 F.3d 59, 64, 66 (1st Cir. 2014) (finding relatedness where foreign defendant regularly provided detailed and ongoing input to plaintiff in Massachusetts for purposes of performance in Massachusetts, helped prepare joint management presentation, and knew contract necessarily would be performed largely in Massachusetts). Though Wehmeyer, "on occasion," sent and received communications via telephone or e-mail while he was in Massachusetts, his and Copia's presence in Jamaica was well established from the beginning of the parties' relationship, through Copia's Jamaican offices, Wehmeyer's Jamaican cell phone, Wehmeyer's meetings with Seawind in Jamaica, Copia's daily post-contract presence at the Jamaican resorts, and, by reasonable inference, Copia's access to the Internet from its offices in Jamaica. Thus, with the exception of the initial service of notice requirement, neither the contract nor the parties' course of dealing mandated that Massachusetts necessarily would be a point of contact for communications. See Adelson, 510 F.3d at 49.

---

[4] Installation, maintenance, and support all took place in Jamaica. There is no evidence in the record that Copia performed any design or service work in Massachusetts or that Seawind expected any such performance here. Moreover, the contract does not require such performance within Massachusetts.

11

Third, the contract did not subject Defendants to "substantial control and ongoing connection to" Massachusetts. Cf. Adelson, 510 F.3d at 46-47, 49 (finding relatedness where nature of employment contract required foreign defendant regularly to report to Massachusetts office and defendant's office was funded through monies deposited in Massachusetts banks). Notably, even Seawind's payments were not required by the contract to be sent into Massachusetts. Cf. Burger King Corp., 471 U.S. at 480 (finding payments contractually required to be made in forum meaningful for jurisdictional purposes).

Finally, Copia's claims do not arise out of any marketing efforts Defendants made in Massachusetts. Copia states in its complaint, "Upon information and belief, the Defendants market and advertise their Secrets Resorts brand in the Commonwealth and conduct their tourism business with Massachusetts residents." Docket #1 ¶ 7. Copia attaches to its opposition "Various Web Pages of Secrets Resorts and AM Resorts," intended to support its contention that Defendants advertise to tourists and travel agents, potentially within Massachusetts.[5] Docket #49 at 3. There is no evidence in the record that Seawind markets or advertises in Massachusetts. To the extent that AMResorts maintains a website or conducts advertising which could reach Massachusetts, such efforts do not give rise to Copia's claims. Therefore, these facts do not satisfy the relatedness requirement for specific jurisdiction.[6] See Adelson, 510 F.3d at 49.

### *Purposeful Availment*

Nothing about the limited contacts Defendants did have with Massachusetts – payments addressed to, and potentially mailed to Massachusetts, or the possibility that Wehmeyer might read emails or receive phone calls here – constitutes purposeful availment of the privilege of

---

[5] AMResorts acknowledges that it maintains a website allowing people to view its hotel brands and make reservations. Docket #29-1 ¶ 4.
[6] As noted previously, Copia relies solely on specific jurisdiction and has not shown, on this record, that general jurisdiction could apply. See note 2.

conducting business in Massachusetts, invoking the benefits and protections of its laws. See Adelson, 510 F.3d 43, 49. "A purpose of the foreseeability requirement [of purposeful availment] is that 'personal jurisdiction over nonresidents ... is a quid for a quo that consists of the state's extending protection or other services to the nonresident.'" Phillips, 530 F.3d at 29 (quoting Sawtelle, 70 F.3d at 1392). A "defendant's awareness of the location of the plaintiff is not, on its own, enough to create personal jurisdiction over a defendant." Phillips, 530 F.3d at 28. Thus, the mere fact that Seawind knew it was contracting with a Massachusetts corporation and might have known that Wehmeyer received some communications while in Massachusetts is insufficient to show that Defendants intended to benefit from the protection of Massachusetts' laws. See Adams, 601 F.3d at 7.

As with the relatedness analysis, the First Circuit considers "contemplated future consequences" in the purposeful availment calculus. Id. at 8. Nothing about the relationship between the parties either put Defendants on notice they were purposefully availing themselves of the protections of the Commonwealth or involved a decision to do so. This is borne out most clearly by the terms of the contract itself, which explicitly calls for its interpretation and governance to be in accordance with Jamaican law, not Massachusetts law. Furthermore, in response to a solicitation from Wehmeyer to Seawind in Jamaica the parties negotiated in Jamaica for Copia to provide services in Jamaica. Merely making payment in Massachusetts and providing for contractual notice to an address in Massachusetts under these circumstances hardly constitutes purposeful availment. See Phillips Exeter Acad., 196 F.3d at 292 (holding defendant's obligation to send certain payments into forum was insufficient to foreshadow susceptibility to suit). That Copia shipped goods from Massachusetts has nothing to do with the Defendants. Nothing about the contract required or suggested that telecommunications

equipment needed to fulfill the contract would come specifically from Massachusetts. Copia does not make that equipment nor does it, per the record, operate some sort of warehouse in Massachusetts, let alone a warehouse of which Defendants were reasonably aware. In short, this is not the case where the contract or the surrounding facts suggested or involved performance in Massachusetts. Defendants would have no reason to "anticipate being haled into court" here. See Adelson, 510 F.3d at 50.

This is in stark contrast to C.W. Downer & Co., in which the First Circuit found that specific jurisdiction could be asserted over a Canadian corporate defendant in a breach of contract claim, where defendant had contracted with plaintiff, a Massachusetts investment bank headquartered in Boston, to be its exclusive financial advisor for the sale of its business. 771 F.3d at 63. There, the parties made initial contact at a meeting in plaintiff's Boston offices. Id. Acting on information divulged at the meeting by defendant's de facto chairman that defendant soon would be sold, plaintiff contacted defendant and negotiations ensued for plaintiff to assist in the sale. Id. Plaintiff's performance under the resulting service contract was centered in Boston, plaintiff's only North American office, including the search for and contact of 206 potential buyers. Id. at 64. From Boston, plaintiff "prepared a detailed Information Memorandum which the parties exchanged with comments eleven times." Id. Plaintiff regularly kept defendant "abreast of its efforts" from Boston and regularly received input in Boston from defendant. Id. The parties prepared a joint presentation for select bidders from their respective home offices and plaintiff hosted a conference call from Boston for defendant and a potential buyer. Id.

The First Circuit reasoned that the genesis of the parties' relationship, plaintiff learning of the sale in its Boston offices from defendant, supported purposeful availment. Id. at 66-67. It found that the parties had "collaborated intensively" with respect to the performance of the

14

contract over the course of four years and that defendant "knew or should have expected" that its "partner team," plaintiff, would perform from Boston, plaintiff's only North American office. Id. at 67. In sum, "[b]y retaining [plaintiff], [defendant] actively caused [plaintiff] to undertake extensive activities on [defendant's] behalf within Massachusetts." Id.

We have no such circumstances here, where Copia initiated contact with Seawind, the center of gravity of the entire relationship was in Jamaica, and Defendants had no reason to expect any performance to occur in Massachusetts.

### *Reasonableness*

Finally, the Gestalt factors weigh against the exercise of jurisdiction. Neither Defendant has any operations or activities in Massachusetts, either related to this contract or not, thus imposing a burden on appearance. Massachusetts has little or no interest in adjudicating a dispute concerning a contract negotiated in Jamaica, executed in Jamaica, calling for performance in Jamaica, requiring the application of Jamaican law, and where virtually the entire course of conduct occurred in Jamaica. The Plaintiff can obtain convenient and effective relief in Jamaica – all the parties are subject to jurisdiction there and Plaintiff itself recognized the possibility of suit there by signing the contract with a provision providing for Jamaican jurisdiction. The final two factors also weigh in favor of not exercising jurisdiction largely for the same reasons.

IV. <u>CONCLUSION</u>

For the foregoing reasons, Seawind Key Investments Limited's Motion to Dismiss (Docket #21) and AMResorts, L.P.'s Motion to Dismiss (Docket #29) are both ALLOWED.

    SO ORDERED.

    /s/ Leo T. Sorokin
    Leo T. Sorokin
    United States District Judge